IN THE US DISTRICT COURT
FOR THE WESTERN DISTRICT OF
MISSOURI

| | |
|---|---|
| **TRISTIAN GRIFFIN** )<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**KANSAS CITY BALLET ASSOCIATION,** )<br>)<br>**Defendant.** ) | Case No. 4:22-CV-00381-SRB |

# AMENDED COMPLAINT

Tristian Griffin ("Plaintiff"), by and through his undersigned counsel of record, brings this action against his former employer, Defendant The Kansas City Ballet Association ("Defendant") alleging unlawful retaliation against Plaintiff for complaining to Defendant about Defendant's racial discrimination against himself and other individuals, and subsequent unlawful discrimination in the making and enforcement of contracts with, and, discharge of, Plaintiff based on his African American/Black race, in violation of 42 U.S.C. § 1981.

## PARTIES

1. Plaintiff Tristian Griffin is a thirty (30) year-old African American/Black male who at all times relevant was and still is a resident of Jackson County, Missouri.

2. Defendant The Kansas City Ballet Association is a domestic nonprofit corporation, incorporated under the laws of the State of Missouri, in good standing, with a Charter No. of N00001421, a Principle Office Address of 500 W. Pershing Rd., Kansas City, MO 64108, and a Registered Address of Jeffrey J. Benchley, 500 W. Pershing Rd., Kansas City, MO 64108, formed on December 30, 1957, that is authorized to do business, and conducts business, in the State of Missouri ("Defendant").

## VENUE AND JURISDICTION

3. This Court has Subject Matter jurisdiction over this case pursuant to 28 U.S.C. §1331.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of

1

the events or omissions giving rise to Plaintiff's claims occurred in this District.

5. Defendant's alleged acts of discrimination and wrongdoing complained of herein occurred in Jackson County, Missouri, and Plaintiff was injured thereby in Jackson County, Missouri, and accordingly, jurisdiction and venue are proper in this Court.

## FACTS APPLICABLE TO ALL COUNTS

6. Defendant Kansas City Ballet Association, though formed as a domestic "nonprofit corporation," owns and/or operates a professional ballet company for profit, The Kansas City Ballet ("KCB Company").

7. Defendant states on its website, https://kcballet.org, that its KCB Company, "[f]ounded in 1957, Kansas City ballet is a 30-member professional ballet company under the direction of Artistic Director Devon Carney and Executive Director Jeffrey J. Bentley."

8. Plaintiff is a professional ballet, modern, and jazz dancer and instructor.

9. Plaintiff's race and ancestry are African American/Black. Plaintiff is also male.

10. In or around 2009 through 2010, Plaintiff trained rigorously in Defendant's KCB School from the age of fifteen (15) to the age of seventeen (17).

11. Plaintiff aspired to dance professionally with KCB Company and expressed this desire to Defendant but was told he "was not ready."

12. Over the course of Plaintiff's training with Defendant, Defendant's agents and employees made comments to Plaintiff indicating that the reason Defendant's professional dance company would not hire Plaintiff as a dancer was not because he "was not ready," but because of physical attributes he possesses based on his African American/Black race.

13. For example, Defendant's agents and employees made comments about Plaintiff's very muscular shape, particularly his buttocks.

14. Despite being rejected for professional employment with KCB as a dancer, Plaintiff went on to train with and dance for much more prominent dance companies, such as Garth Fagan Dance, led by

2

Garth Fagan, the choreographer of The Lion King on Broadway in New York, NY, and the Kansas City Friends of Alvin Ailey, which is the presenter and second home of New York's Alvin Ailey American Dance Theater and its second junior company, Ailey II.

15. Defendant touts diversity and inclusion of racial and ethnic minorities on its website through "Community Engagement & Education" and Defendant's Reach Out and Dance Scholarship Program ("R.O.A.D. Scholarship Program"), which Defendant describes on its website as follows:

> In September 2017, Kansas City Ballet initiated a unique partnership with Kansas City Public Schools in Missouri and with Turner Unified Schools in Kansas to bring a free 12-week dance residency program, Reach Out and Dance (known as R.O.A.D.), to all third-grade students in 16 elementary schools. Each spring, up to 112 students from 16 R.O.A.D. Residency schools are invited to study dance on scholarships during the school day at the Todd Bolender Center for Dance & Creativity, home of Kansas City Ballet.
>
> R.O.A.D. Scholars receive free dancewear and ballet slippers, two tuition-free classes per week for 12 consecutive weeks each spring and for eight weeks each summer, and complimentary tickets for themselves and a family member to attend a Kansas City Ballet performance.
>
> Subsequently, each fall, 30 R.O.A.D. Scholars are invited to train in the Kansas City Ballet School for the next two years. As part of The Academy, R.O.A.D. Scholars are eligible to audition for Kansas City Ballet's production of The Nutcracker.[1]
>
> Interested in learning more about our R.O.A.D Scholars program? Contact April Berry.

16. Defendant states on its website that its R.O.A.D. Scholarship Program partners with:

> Kansas City Public Schools (KCPS)
> Turner Unified School District (TUSD)
> Kansas City Kansas Schools (KCK)
> Shawnee Mission Schools (SMSD)
> Select Charter Schools
> Select Parochial Schools
> Select Private Schools

17. At all times relevant, Defendant employed April Berry, as the Director of Community Engagement & Education and the R.O.A.D. Scholarship Program.

---

[1] *See* https://kcballet.org/for-community/r-o-a-d-scholarship-program/

18. At all times relevant herein, Ms. Berry was an employee and agent of Defendant whose actions where expressly authorized, adopted, and ratified by Defendant. Ms. Berry is a mixed-race African American/Black female.

19. Ms. Berry is on the Administrative Staff of Defendant's Kansas City Ballet School.

20. At all times relevant, Defendant employed Plaintiff as a dance instructor in its R.O.A.D. Scholarship Program.

21. Plaintiff began teaching jazz and contemporary dance and R.O.A.D. Scholarship Program classes for Defendant in or around 2019.

22. Plaintiff generally had a good relationship with Ms. Berry but began having issues with her after questioning her direction that R.O.A.D. Scholarship Program participants selected to train at the KCB School as "R.O.A.D. Scholars" possess the "ideal ballet body-type," despite the fact that almost all students in the R.O.A.D. Scholarship Program were not white and thus would not possess that body type.[2]

23. In or around the middle of 2020, Defendant held a mid-term audition for students in the R.O.A.D. Scholarship Program where Defendant's KCB School and R.O.A.D. Scholarship Program teachers came together to select students from the audition that they felt held a promise for dance training and a professional dance career. These selected students would be considered "R.O.A.D. Scholars" and would be invited to train at Defendant's KCB School on scholarship.

24. In the above referenced meeting by Defendant's teachers to review candidates for the R.O.A.D. Scholarship Program, Ms. Berry told Plaintiff and the other teachers to only accept students who had the "ideal ballet body type" and to not accept students who were "on the chubby side," specifically stating that regardless of whether the candidate met all criteria required by the R.O.A.D. Scholarship

---

[2] *See* "Ballet Blanc to Ballet Black_ The ideal ballet body is a European one - Girl Museum," by Georgia License, *Junior Girl*, Girl Museum, Inc., May 13, 2021, *available at* https://www.girlmuseum.org/ballet-blanc-to-ballet-black-the-ideal-ballet-body-is-a-european-one/ ("The buttocks symbolizes the dichotomy between European and African aesthetic values. The positive cultural values attached to different body parts are neglected in the ballet world and these figures are made to feel undesirable. The idolization of slim and fair dancers entirely disregards the beauty ideals of the African diaspora, for example.").

4

Program, to be considered a R.O.A.D. Scholar (*i.e.*, a participant), the child "must not be overweight or have excess body fat."

25. On information and belief, most of the children auditioning for Defendant's R.O.A.D. Scholarship Program are non-white students of color who do not possess the "ideal ballet body type."

26. On information and belief, most of the children auditioning for Defendant's R.O.A.D. Scholarship Program come from disadvantaged and underserved communities of low socioeconomic status that rely heavily on the State's Welfare and Social Services.

27. Plaintiff felt that, practically speaking, Ms. Berry's instructions were intended to exclude minority children from attending the R.O.A.D. Scholarship Program/KCB School who, based on the characteristics and qualities of their non-white races, did not possess the ideal (white) "ballet body type" prized by Defendant and other primarily white ballet companies.

28. Based on Plaintiff's knowledge of Defendant's practices, gained through Plaintiff's pre-professional training at the KCB School and in the course of his teaching for Defendant, Defendant does not similarly restrict admission to the KCB School of children "who are not overweight or have excess body fat."

29. Plaintiff objected to Ms. Berry's direction that students admitted to the R.O.A.D. Scholarship Program must all possess the ideal ballet body type, expressing that the very purpose of the R.O.A.D. Scholarship Program was to encourage physical activity in underserved and disadvantaged communities and that the scholarships offered could result in the auditioning children achieving a healthier body composition, stating "these are kids – we can't really say based upon their weight right now that they shouldn't qualify if they otherwise would."

30. Ms. Berry snapped back at Plaintiff that her directions came from the "higher-ups," and that "these things were out of her control."

31. After the foregoing event, in or around September of 2020, Ms. Berry held a Zoom meeting with Plaintiff meeting attended by herself, and Mr. Sean Duus, another employee / agent of

Defendant and R.O.A.D. Scholarship Program teacher, during which Ms. Berry stated that she thought Plaintiff should reevaluate his teaching curriculum.

32. At this time, Plaintiff had been working for Defendant for approximately one (1) year.

33. Prior to calling the foregoing Zoom meeting, Ms. Berry had never taken issue or questioned Plaintiff's teaching curriculum.

34. During the Zoom meeting, Ms. Berry asked Plaintiff, "What are you teaching?"

35. Plaintiff explained to Ms. Berry that he was teaching jazz dance, in the choreography styles of Eugene Louis Faccuito ("Luigi") and Gus Giordano, both of whom are white jazz dance teachers and pioneers of classical jazz dance.

36. Ms. Berry stated to Plaintiff, "[a]lright well, I am very surprised you aren't supporting African American jazz dance teaching and dance pioneers."

37. Plaintiff responded to Ms. Berry's comment that he had been taught the choreography and jazz dance styles of Luigi and Giordano as a pre-professional student at Defendant's KCB School and had not had training in whatever dance styles were being referenced by Ms. Berry and that he would need to be educated on the same.

38. Ms. Berry then told Plaintiff he should use more people like Garth Fagan, a Jamaican modern dance choreographer, as opposed to jazz dance pioneers such as Luigi and Giordano.

39. In response to Ms. Berry, Plaintiff reminded her that he had worked with Garth Fagan, and that although Mr. Fagan used jazz music in his choreography, he was not a jazz dance pioneer by any means, and that representing Mr. Fagan's choreography and dance style as that of a Black jazz dance pioneer to R.O.A.D. Scholarship Program students would not be factually accurate.

40. Ms. Berry then said to Plaintiff, "since you're an African American male, you should teach about Black jazz dance pioneers, instead of teaching about white dancers and choreographers."

41. Plaintiff was shocked to receive the above discriminatory comments from Ms. Berry, particularly when Defendant touts diversity and inclusion and, supposedly, created the entire R.O.A.D.

6

Case 4:22-cv-00381-SRB    Document 13    Filed 07/26/22    Page 6 of 13

Scholarship Program in furtherance of those goals, and told Ms. Berry that he found her remarks based on his race African American/Black race to be highly offensive and unprofessional.

42. In response, Ms. Berry told Plaintiff that he should not talk back because she knew more than Plaintiff and was his superior in terms of authority from Defendant.

43. Later in the same day after the foregoing Zoom meeting had taken place, Plaintiff spoke to Mr. Duus, who stated his opinion to Plaintiff that he [Plaintiff] had seemed defensive to Ms. Berry's feedback and that she [Ms. Berry] had not appreciated it.

44. Plaintiff responded to Mr. Duus that had found the discriminatory remarks, statements, and impositions made on him by Ms. Berry because of his race offensive and unprofessional, which he also had not appreciated.

45. Mr. Duus encouraged the Plaintiff to reach out to Ms. Berry, warning, "the more you sit on it the worse it will get."

46. Plaintiff tried to reach out to Ms. Berry to set up an appointment to discuss what had transpired but was unable to do so before his employment with Defendant was terminated by Ms. Berry.

47. On Friday, September 18, 2020, Ms. Berry sent Plaintiff an email terminating his employment with Defendant, stating, "I am writing to let you know that at this time I feel you are not able to devote the necessary time, focus, and commitment that is required of a KC Ballet R.O.A.D. teaching artists. So, regrettably, I am relieving you of all of your KC Ballet R.O.A.D. classes this semester. I wish you the best in your future endeavors."

48. In response to the above email, Plaintiff wrote Ms. Berry a letter explaining that her statement that he "was not able to devote the necessary time, focus, and commitment," was not the truth, because he had always returned missed phone calls, texts, or emails within twenty- four (24) hours and had proven his ability to perform professionally as well as continue teaching for Defendant.

49. Ms. Berry never responded to Plaintiff's letter.

50. After Defendant's termination of Plaintiff, multiple individuals employed by Defendant

reached out to Plaintiff, including an individual named Grace, who worked in Defendant's Human Resources department, who told Plaintiff that "[w]hat April [Ms. Berry] had said was not okay and that her thoughts did not represent the KCB."

51. But the foregoing appeared to be lip-service because neither Grace nor any other employee or agent of Defendant's offered to reinstate Plaintiff's position with Defendant or even told Plaintiff that they would investigate Ms. Berry's conduct.

52. Sometime after Plaintiff had retained his undersigned counsel, Defendant's HR employee(s) or agent(s) tried to arrange a meeting with Plaintiff, but asked him to "not bring his lawyer," which Plaintiff's counsel advised him against.

53. Defendant has made no efforts to rectify or even investigate Ms. Berry's offensive and discriminatory remarks and statements to Plaintiff, such as reinstating Plaintiff's position or offering him financial redress for Ms. Berry's discrimination against Plaintiff based on his African American/Black race.

54. Plaintiff's termination by Kansas City Ballet was significantly detrimental to Plaintiff's teaching career in that he has had to travel outside of the States of Kansas and Missouri to obtain work to make up for the lost income previously paid to him by Defendant.

55. The fact of Defendant's discharge of Plaintiff will adversely impact him for the rest of his career due to the fact that Defendant's KCB Company and School are the largest and most prominent professional dance company and affiliated school in the States of Missouri and Kansas.

56. As a result of being wrongfully discriminated against and terminated by Defendant, Plaintiff has suffered economic damages in the form of lost wages and income and associated non-pecuniary loss and damages including career damage and diminished career potential, mental distress, and anguish in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, diminished pension, and other non-pecuniary losses, as will be shown by the evidence.

**COUNT I: VIOLATION OF 42 U.S.C. §1981**

For Count I of his Amended Complaint against Defendant, Plaintiff states the following:

8

Case 4:22-cv-00381-SRB   Document 13   Filed 07/26/22   Page 8 of 13

57. Plaintiff hereby incorporates by reference the allegations previously and hereafter stated into Count I of his Petition.

58. 42 U.S.C.S. § 1981 Equal Rights Under the Law:

**(a)** **Statement of Equal Rights.** All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."
**(b)** **"Make and enforce contracts" defined.** For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
**(c)** **Protection against impairment.** The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C.S. § 1981 (LexisNexis, Lexis Advance through Public Law 117-51, approved October 19, (2021)).

59. At all times relevant herein, Ms. April Berry was an employee and agent of Defendant, acting within the course and scope of her agency and employment with Defendant, whose actions were expressly authorized and ratified by Defendant, thus making Defendant liable for Ms. Berry's actions under the doctrine of *respondeat superior*.

60. During the course and scope of Plaintiff's employment, Defendant's representatives, agents, and employees, acting within the course and scope of their employment, including, but not limited to, Ms. Berry, engaged in intentional discrimination against Plaintiff based on his African American/Black race and ancestry in the making and enforcement of a contract with Plaintiff by terminating him for refusing to accept Ms. Berry's demands that he teach Black jazz dance instead of white jazz dance simply because Plaintiff himself is Black.

61. Defendant and its employees and agents engaged in these discriminatory practices with malice and/or reckless indifference to Plaintiff's federally protected civil rights.

62. Specifically, Defendant terminated Plaintiff's employment because he refused to accept Ms. Berry's direction that he teach Black jazz dance and choreography instead of white jazz dance and choreography because he himself is African American/Black and told Ms. Berry that he found her remarks

9

highly offensive, inappropriate, and unprofessional.

63. Defendant's termination of Plaintiff by Ms. Berry for the alleged reasons that Plaintiff was "not able to devote the necessary time, focus, and commitment that is required of a KC Ballet R.O.A.D. teaching artist" was pretext for Defendant's unlawful discrimination against Plaintiff in the making and enforcement of contracts with Defendant on the basis of his African American/Black race because neither Ms. Berry nor any other agent or employee of Defendant's had ever previously raised the above alleged issues with Plaintiff.

64. Plaintiff is entitled to punitive damages from Defendant to punish Defendant and to deter it and others from like conduct because the actions and conduct of Defendant set forth herein and to be discovered were outrageous and showed evil motive, reckless indifference, or conscious disregard for the rights of Plaintiff and others, in that Defendant uses its R.O.A.D. Scholarship Program to obtain partnership with both public and private schools and to gain the favor of the communities of schools it partners with, and accepts donations from private individuals and organizations for the R.O.A.D. Scholarship Program, but secretly perpetuates institutionalized discrimination against racial minority children that the Program claims to help by refusing to admit them if they do not possess physical attributes of the white, ideal ballet body type, as demonstrated by Ms. Berry's statement to Plaintiff that her directions came from Defendant's "higher-ups" after he questioned her direction that all R.O.A.D. Scholars must possess the "ideal ballet body type."

65. As a direct and proximate cause of the actions and conduct set forth herein, Plaintiff has suffered and will continue to suffer damages including lost wages, career damage and diminished career potential, emotional distress, and anguish in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, diminished pension, physical manifestations of such emotional distress, and other non-pecuniary losses.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count I of his Amended Complaint, for a finding that he has been subjected to unlawful discrimination by Defendant in the making

and enforcement of contracts on the basis of Plaintiff's African American/Black race, in violation 42 U.S.C. § 1981, *et seq*, for an award of compensatory and punitive damages; equitable relief; for his costs expended; for his reasonable attorneys' fees and expert's fee provided by 42 U.S.C. § 1981 and for such other relief as this Court deems just, equitable, and proper.

## COUNT II: 42 U.S.C. §1981 – RETALIATION

COMES NOW Plaintiff and for Count II of his Amended Complaint against Defendant states and alleges as follows:

66. Plaintiff incorporates by reference the preceding paragraphs of this Amended Complaint as though fully set forth herein.

67. Plaintiff's complaints to Defendant's discrimination and encouragement of discrimination against racial and ethnic minority children auditioning for Defendant's R.O.A.D. Scholarship Program constituted free speech, which is a statutorily protected activity.

68. By reason of Plaintiff's complaints, Defendant, through Ms. Berry, retaliated against Plaintiff by calling a Zoom meeting with Plaintiff wherein Defendant harassed and discharged Plaintiff on the basis of his African American/Black race.

69. At all times mentioned herein, before and after, the above-mentioned individuals, including, but not limited to, Ms. Berry, Mr. Duus, and Grace were agents, servants, and employees of Defendant and were at all times acting within the course and scope of their employment.

70. Defendant's retaliation against Plaintiff was intentional, malicious, and constituted a willful violation of Plaintiff's federally protected civil rights.

71. At the time Defendant retaliated against Plaintiff, Defendant knew that such retaliation was unlawful.

72. The actions and conduct set forth herein was outrageous and showed evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and therefore Plaintiff is entitled to punitive damages from Defendant to punish and deter Defendant and others from like conduct.

73. As a direct and proximate cause of the actions and conduct set forth herein, Plaintiff has suffered and will continue to suffer damages including lost wages, career damage and diminished career potential, emotional distress, and anguish in the form of embarrassment, degradation, humiliation, anxiety, loss of enjoyment of life, loss of sleep, diminished pension, physical manifestations of such emotional distress, and other non-pecuniary losses.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count II of his Amended Complaint, for a finding that he has been subjected to unlawful retaliation in violation 42 U.S.C. § 1981, *et seq*, for an award of compensatory and punitive damages; equitable relief; for his costs expended; for his reasonable attorneys' fees and expert's fee provided by 42 U.S.C. § 1981 and for such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all Counts alleged herein.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates the United States District Court for the Western District of Missouri, located in Kansas City, Missouri as the place of trial.

Respectfully Submitted,

**THE LAW OFFICE OF JASMINE ABOU-KASSEM, LLC**

/s/ Jasmine Abou-Kassem
Jasmine Abou-Kassem, MBN 61614
1301 Oak Street, Suite 613
Kansas City, MO 64016
Office: (816) 298-5214
Mobile: (816) 516-0958
Email: jasmine@jaklawllc.com

**HOLMAN SCHIAVONE, LLC**

/s/ Michael Shaun Stallworth
M. Shaun Stallworth, MO. Bar #60764

Holman Schiavone, LLC<br>
4600 Madison Avenue, Suite 810<br>
Kansas City, Missouri 64112<br>
Phone: 816.283.8738<br>
Fax: 816.283.8739<br>
sstallworth@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the twenty-sixth day of July 2022, the foregoing was electronically filed via the Court's e-filing system and served via e-mail to the following counsel of record:

Kathryn S. Rickley (MO #59435)
Mitchell E. Wood (MO #59663)
HALBROOK WOOD, PC
3500 West 75th Street, Suite 300
Prairie Village, Kansas 66208
TEL: (913) 529-1188
FAX: (913) 529-1199
E-MAIL: mwood@halbrookwoodlaw.com
E-MAIL: krickley@halbrookwoodlaw.com

**ATTORNEYS FOR DEFENDANT**

*/s/ Jasmine Abou-Kassem*
ATTORNEY FOR PLAINTIFF

13

Case 4:22-cv-00381-SRB   Document 13   Filed 07/26/22   Page 13 of 13